## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOHNNA HAYS,**

      **Plaintiff,**

v.                                  **USDC Civ. No. 17-700 JCH/KK**

**SOCIAL SECURITY ADMINISTRATION,**
**NANCY BERRYHILL, Acting Commissioner**
**of Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 14) filed May 3, 2018, in support of Plaintiff Johnna Hays' ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits. On August 5, 2018, Plaintiff filed her Motion to Reverse or Remand. (Doc. 25.) The Commissioner filed a Response in opposition on October 5, 2018 (Doc. 27), and Plaintiff filed a Reply on October 15, 2018 (Doc. 28). The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken in part and recommends that it be **GRANTED** insofar as it seeks remand.

### I.      Background and Procedural Record

Plaintiff alleges that she was disabled for a closed period lasting from September 28, 2011, through August 1, 2016, because of mood disorder, posttraumatic stress disorder (PTSD), psychosis, major depressive disorder, bipolar disorder, and attention deficit hyperactivity disorder

(ADHD). (AR. 105, 525, 528, 777.) Plaintiff completed vocational school to become a licensed practical nurse, and she worked in that capacity from January 1996 until the alleged onset of her disability in September 2011. (AR. 87.) Plaintiff reported that she left work in 2011 because her employer learned that she was bipolar and began harassing her, which eventually led to a suspension, and after which she "had several drawbacks" related to her conditions that prevented her from returning to work. (AR. 577-78.) After her alleged onset date, Plaintiff returned to college and completed approximately one-half of a two-year program related to electronic health information. (AR. 579-80, 1419-20.) At the end of July 2016, Plaintiff resumed work part-time as a licensed practical nurse and, by September 2017, she had switched to a PRN schedule—meaning that Plaintiff's employer calls her as she is needed and, depending on how she feels, she accepts or declines the shift. (AR. 567, 584-85.)

On June 6, 2012, Plaintiff protectively filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401 et seq., and an application for supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (AR. 83.) Plaintiff's applications were initially denied on October 10, 2012, and they were denied upon reconsideration on December 20, 2012. (AR. 81-124.) On January 10, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Doc. 141), and on September 3, 2013, ALJ Ben Willner held a hearing. (AR. 26-39.) On February 24, 2014, ALJ Willner found that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Act. (AR 38-39.) Plaintiff appealed ALJ Willner's decision, but the Appeals council denied her request for review. (AR 552.) Plaintiff then appealed the decision to this Court, and Magistrate Judge Steven Yarbrough remanded the matter to the Commissioner based upon ALJ Willner's failure to consider and explain the weight assigned to the opinion of Plaintiff's treating physician. (AR. 634-49.)

On remand, on September 7, 2016, ALJ Lillian Richter held a hearing on Plaintiff's applications. (AR. 558.) Plaintiff appeared in person at the hearing with her attorney Jonathan Woods.[1] (AR. 560.) The ALJ took testimony from Plaintiff (AR 563-93), and from an impartial vocational expert ("VE") Cornelius Ford (AR. 593-99). On May 11, 2017, ALJ Richter issued an unfavorable decision. (AR. 525-43.) That decision became the final agency decision from which Plaintiff now appeals. (AR. 506.) *See* 20 C.F.R. §§ 404.984(d), 416.1484(d).

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)     At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[2] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)     At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)     At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of

---

[1] Plaintiff is represented in these proceedings by attorney Benjamin Decker. (Doc. 25 at 24.)
[2] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)     If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987).  The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.      Standard of Review**

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## II.     Analysis

At step five of the sequential evaluation, ALJ Richter determined that Plaintiff was not disabled. (AR 541-42.) Specifically, the ALJ determined that Plaintiff met the insured status requirements of the Act through December 31, 2016. (AR. 528.) She found that Plaintiff did not engage in substantial gainful activity from the alleged onset date of disability, September 28, 2011, through the end of the requested closed period of disability, August 1, 2016. (Id.) The ALJ also found that Plaintiff had the following severe impairments: mood disorder, PTSD, psychosis, major

depressive disorder, bipolar disorder, and ADHD. (Id.) She found that Plaintiff's impairments did not meet or equal the severity of one of the listings described in Appendix 1 of the regulations. (Id.) As such, she proceeded to step four and found that Plaintiff had the residual functional capacity to perform a limited range of medium work as defined in 20 C.F.R. Sections 404.1567(c) and 416.967(c). (AR. 529.) The ALJ added that

> [s]pecifically, [Plaintiff] could lift, carry, push and pull up to 50 pounds occasionally and up to 25 pounds frequently, and she could stand for up to 6 hours and sit for up to 6 hours in an 8-hour workday. She was limited to frequent handling and fingering bilaterally and to occasional overhead reaching with the right upper extremity.[3] Additionally, she was limited to simple, routine and repetitive work, and to making simple work-related decisions in a workplace with few changes in the routine work setting. She was limited to occasional interaction with supervisors and incidental interaction with coworkers and members of the public. She could not work in tandem with other employees.

(AR. 529-30.) At step five, ALJ Richter determined that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform from the alleged onset date through August 1, 2016 and, therefore, Plaintiff was not disabled during that time frame. (AR. 541-42.)

In support of her Motion, Plaintiff argues that (1) the ALJ's RFC analysis was flawed because she failed to properly weigh the testimony of Plaintiff's treating psychiatrist, Dr. Michael Sievert both as a matter of law (because she failed to employ the proper legal analysis) and as a matter of fact (because she failed to properly consider Plaintiff's treatment records) (Doc. 25 at 15-16; AR. 532); (2) the ALJ failed to properly weigh the opinions of Plaintiff's treating therapists, Jill Zomerhuis, LPAT, and John Rabka, M.A., LPCC (Doc. 25 at 17-18; AR. 535-36); (3) that the

---

[3]The ALJ considered other medically determinable impairments, including those related to mild degenerative disc disease of the cervical spine, alcohol abuse in remission, carpal tunnel syndrome, torn rotator cuff of the right shoulder, and onychomycosis to be non-sever impairments. (AR. 528.) Plaintiff's appeal does not concern the ALJ's decision regarding these impairments.

opinions of these treatment providers should have been weighed more heavily than that of psychological consultative examiner Dr. Davis Brimberg (AR 537; Doc. 25 at 22-23); and (4) the ALJ's findings regarding the intensity and persistence of Plaintiff's symptoms were improper because these findings were contradicted by substantial evidence (Doc. 25 at 18-22).

For the reasons discussed below, the Court recommends that Plaintiff's motion be granted on the ground that the ALJ failed to apply the proper legal standards in her evaluation of the opinions of Plaintiff's treatment providers.

## A. **Mental Health Opinion Evidence**

The evidence of record reflects that Plaintiff has received mental health treatment since 2010. Records indicate that Plaintiff received monthly medication management and therapy at Sage Neuroscience Center from September 2010 through December 2011, and in May 2012. (AR. 304-322.) These treatment notes consistently reflect that Plaintiff was depressed and anxious and that she variously suffered from increased mania, PTSD symptoms, and poor sleep, among other things. (Id.)

Most of the treatment-related evidence of record is from Presbyterian Medical Services, Rio Rancho Family Health Center (PMS) where Plaintiff received therapy and medication management services beginning in December 2012 and continuing at least through August 2016. (See AR. 408, 1238.) Among other providers at PMS, Plaintiff received treatment from medical doctors Tait Dalton and Michael Sievert. From December 3, 2012 through February 26, 2014, Plaintiff saw Dr. Dalton thirteen times for medication management. (AR. 388, 405, 408, 415, 418, 423, 428, 461, 861, 888, 892, 902, 932.) Plaintiff saw Dr. Sievert for medication management twenty times between May 2014 and July 2016. (AR. 476, 482, 962, 986, 993, 997, 1015, 1020, 1028, 1033, 1039, 1047, 1089, 1104, 1120, 1131, 1146, 1184, 1202, 1232.) Plaintiff received

therapy at PMS from Jill Abrams Apodaca, LPAT; Jill Zomerhuis, LPAT; and John Rabka, LPCC. From January through February 2013, Plaintiff saw LPCC Rabka seven times. (AR. 375, 377, 379, 384, 386, 391, 393.) Plaintiff saw LPAT Zomerhuis twenty-four times from July 2013 through September 2014. (AR. 426, 433, 435, 457, 474, 493, 496, 866, 874, 877, 883, 885, 895, 898, 900, 918, 928, 937, 960, 969, 975, 979, 981, 1367.) And she saw LPAT Apodaca twenty times from April 2015 through August 2016. (AR. 1024, 1026, 1044, 1059, 1067, 1069, 1086, 1095, 1116, 1125, 1152, 1173, 1176, 1191, 1194, 1197, 1215, 1218, 1226, 1238.)

### **LPCC Rabka's Opinions**

On April 8, 2014, LPCC Rabka completed a "Medical Assessment of Ability to do Work-Related Activities" form[4], on which he assessed Plaintiff's limitations in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (AR. 468-69.) LPCC Rabka assessed Plaintiff as having *marked limitations* in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods of time (*i.e.* 2 hour segments); (4) sustain an ordinary routine without special supervision; (5) complete a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) accept instructions and respond appropriately to criticism from supervisors; (7) travel in unfamiliar places or use public transportation; and (8) set realistic goals and making plans independently of others. (AR. 468-69.)

LPCC Rabka assessed Plaintiff as having *moderate limitations*: (1) remembering locations and work-like procedures; (2) understanding and remembering very short and simple instructions; (3) carrying out very short and simple instructions; (4) performing activities within a schedule

---

[4] The form instructed LPCC Rabka to assess Plaintiff's capabilities based on her medical history from 2012 to the date of the examination. (AR. 468)

maintaining regular attendance and being punctual within customary tolerance; (5) working in coordination with/ or proximity to others without being distracted by them; and (6) making simple work-related decisions (AR. 468-69.)

LPCC Rabka's handwritten notes related to understanding and memory indicate that "pressure from expectations of productivity in average work settings impacts short term memory and basic instructions to a level of panic." (AR. 468.) In regard to sustained concentration and persistence, LPCC Rabka noted "[d]istractibility is high due to high levels of being readily and easily overwhelmed and worried commensurate with anxiety diagnosis." (AR. 468.) He noted, as to social interaction, that "[i]ncreased problems with distrust of co-workers or general public outside of work and of authority figures [is] typical of anxiety diagnosis." (AR. 469.) And he noted as to adaptation that Plaintiff had "[d]ifficulty to significant degree to changes or the unfamiliar due to daily & consistent anxiety symptoms. Can emotionally and behaviorally shut-down on the job or in other communications due to this." (AR. 469.) Finally, as to "any additional significant mental limitations" LPCC Rabka listed: "paranoia, hypervigilance, frequent feelings of hopelessness, panic, of clinical nature, panic, anxiety, and depressive symptoms commensurate of a diagnosis of PTSD." (AR. 469.)

**LPAT Zomerhuis' Opinions**

LPAT Zomerhuis completed a "Medical Assessment of Ability to do Work-Related Activities" form on April 16, 2014.[5] (AR. 471-72.) LPAT Zomerhuis assessed that Plaintiff had *marked limitations* (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods of time (*i.e.* 2 hour segments); (4) working in coordination with/ or proximity to others without being distracted

---

[5] The form instructed LPAT Zomerhuis to assess Plaintiff's capabilities based on her medical history from 2012 to the date of the examination. (AR. 471)

by them; (5) completing a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) interacting appropriately with the general public; (7) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; (8) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and (9) responding appropriately to changes in the work place. (AR 471-72.)

LPAT Zomerhuis assessed Plaintiff as having *moderate limitations* (1) remembering locations and work-like procedures; (2) understanding and remembering very short and simple instructions; (3) carrying out very short and simple instructions; (4) performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerance; (5) sustaining an ordinary routine without special supervision; (6) making simple work-related decisions; (7) asking simple questions or requesting assistance; (8) accepting instructions and responding appropriately to criticism from supervisors; (9) being aware of normal hazards and taking adequate precautions; (10) travelling in unfamiliar places or using public transportation; and (11) setting realistic goals and making plans independently of others. (AR 471-72.)

LPAT Zomerhuis' handwritten notes indicate that Plaintiff "has tangential thought process which makes it difficult for her to follow one conversation." (AR. 471.) She "[h]as difficulty getting along with others [and] with excess stimuli." (AR. 471.) She "does not bathe or wash her hair except for once every week or every other week." (AR. 472.) And she "has hallucinations which interfere with her daily functioning." (AR. 472.) As to "any additional significant limitations" LPAT Zomerhuis noted that Plaintiff has "[t]rouble getting out of the house due to depression, has paranoia [and] manic episodes when she is out of control [, and] hallucinations." (AR. 472.)

On September 16, 2016, LPAT Zomerhuis completed a second "Medical Assessment of Ability to do Work-Related Activities" form. (AR. 1406-07.) This time, LPAT Zomerhuis was instructed to consider Plaintiff's limitations from one year prior to her initial visit to the current examination. (AR. 1406.) LPAT Zomerhuis' assessment of Plaintiff's limitations was unchanged with the following exceptions. She assessed Plaintiff as having *marked limitations* in her abilities to (1) to understand and remember very short and simple instructions; and (2) accept instructions and respond appropriately to criticism from supervisors. (AR. 1406-07; see 471-72.) She assessed *moderate limitations* in Plaintiff's ability to (1) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) interact appropriately with the general public; (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (4) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (5) respond appropriately to changes in the work place. (AR. 1406-07, see 471-72.) And she assessed only *slight limitations* in Plaintiff's ability to: (1) carry out very short and simple instructions; (2) to perform activities within a schedule; and (3) be aware of normal hazards and take adequate precautions. (AR 1406-07.) As to "any additional significant limitations" LPAT Zomerhuis noted that Plaintiff "suffers severe bipolar [disorder] with some psychotic features [and] is impaired with [activities of daily living,] communication[,] etc." (AR 1407.)

On September 6, 2016, LPAT Zomerhuis also completed forms for Listing 12.04 *Affective Disorders* and 12.06 *Anxiety-Related Disorders*, and assessed that Plaintiff satisfied the criteria for both. (AR. 1408-09.) LPAT Zomerhuis assessed, among other things, that Plaintiff had: *marked* restriction of activities of daily living; *marked* difficulties in maintaining social functioning;

*marked* difficulties in maintaining concentration, persistence and pace; and repeated episodes of decompensation each of extended duration.  (AR. 1408-09.)

### **Dr. Sievert's Opinions**

On September 2, 2016, Dr. Sievert completed a "Medical Assessment of Ability to do Work-Related Activities" based on Plaintiff's medical history dating back to 2011.  (AR. 1260.) Dr. Sievert assessed Plaintiff as having marked limitations (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods of time; (4) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerance; (5) sustaining an ordinary routine without special supervision; (6) completing a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) accepting instructions and responding appropriately to criticism from supervisors; (8) responding appropriately to changes in the workplace; and (9) being aware of normal hazards and taking adequate precautions.  (Id.)

Dr. Sievert assessed Plaintiff as having moderate limitations (1) working in coordination with/or proximity to others without being distracted by them; (2) interacting appropriately with the general public; (3) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; (4) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; (5) travelling in unfamiliar places or using public transportation; and (6) setting realistic goals or making plans independently of others. (Id.)

Dr. Sievert also completed forms for Listing 12.04 *Affective Disorders* and 12.06 *Anxiety-Related Disorders*, and assessed that Plaintiff satisfied the criteria for both.  (AR. 1263-64.)  On the form for Listing 12.04 *Affective Disorders* Dr. Sievert opined that Plaintiff had depressive

syndrome and manic syndrome resulting in marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence and pace; he opined, further, that she had "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate[.]" (AR. 1263.) On the form for Listing 12.06 *Anxiety-Related Disorders*, Dr. Sievert opined that Plaintiff had generalized persistent anxiety resulting in marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace. (AR. 1264.)

### Psycho-Educational Testing

In October 2013, Plaintiff's DVR counselor referred her to Mark Arcuri, Ph.D for a psycho-educational testing battery to determine her school and vocational school accommodation needs. (AR. 1275.) Dr. Arcuri recommended accommodations in and out of school to include: (1) learning opportunities with a variety of verbal and visual stimuli; (2) read materials aloud when studying and testing; (3) track page with a blank paper when reading; (4) preferential seating in front of room in school; (4) tape record lectures for playback while studying in order to minimiz[e] competing demands (i.e., attending and taking notes at the same time) while listening to lectures in the classroom; (5) extra time (2x) on examinations due to attentional problems; (6) use of a calculator for mathematics tests; (5) mathematics tutoring; and (5) separate testing room due to reading material out loud and need for extra time. (AR. 1276-77.)

### Mental Disability Evaluation

On September 17, 2012, Dr. Davis Brimberg conducted a Mental Disability Evaluation of Plaintiff. (AR. 333-36.) The examination lasted for fifteen minutes. (AR. 537-38.) Dr. Brimberg reviewed six medication management notes from Sage Neurosicence Center taken in 2011 and

2012, and he observed that a treatment note from May 2012 indicated that Plaintiff was not compliant with her medication, but the remaining treatment notes (from 2011) indicate that she *was* compliant with medication. (AR. 333.) Dr. Brimberg assessed Plaintiff's prognosis as "poor due to the nature of her long-standing symptoms and history of suicidal ideation and attempts." (AR. 336.) And, his functional assessment of Plaintiff was that she "showed a good ability to reason, understand and remember information"; "[s]he demonstrated the basic ability to concentrate"; she "showed a good ability to interact socially during the evaluation"; and she "demonstrated a good ability to adapt to social and work situations." (AR. 336.)

The ALJ accorded "some weight, but not controlling weight" to Dr. Sievert's opinions. (AR. 536.) And she accorded "some weight" to the opinions of LPCC Rabka and LPAT Zomerhuis. (AR. 535-36.) The ALJ accorded "significant weight" to the opinions of Dr. Acuri and Dr. Brimberg.[6] (AR. 537-38.)

**B. The ALJ Did Not Adequately Evaluate the Opinions of Plaintiff's Treatment Providers in accordance with governing legal standards**

The ALJ failed to assess whether Dr. Sievert's opinions were supported by the medical evidence, failed to meaningfully analyze Dr. Sievert's opinions pursuant to relevant factors, and "cherry-picked" evidence in rejecting his opinions concerned Plaintiff's functional limitations. The ALJ also improperly weighed the opinions offered by LPAT Zomerhuis and LPCC Rabka by failing to address the degree to which these opinions are consistent with the therapists' treatment notes, with the opinions offered by Plaintiff's other treatment providers, and the record as a whole.

---

[6] She also accorded "significant weight" to the opinions of Candace Mihm, Ph.D. and Cathy Simutis, Ph.D., state agency psychological consultants who reviewed the medical evidence of record as of 2012, and concluded, based thereon, that Plaintiff was not disabled. (AR. 102, 124, 539.)

As a "treating source" psychiatrist, Dr. Sievert's opinions are governed by the treating physician rule.[7] *See* SSR 06-03P, 2006 WL 2329939 at *1-2 (explaining that only "acceptable medical sources" including licensed physicians can be considered "treating sources" whose opinions may be entitled to controlling weight). An ALJ is required to conduct a two-part inquiry with regard to treating physicians, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Krauser*, 638 F.3d at 1330. A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2[8]). If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process. *Krauser*, 638 F.3d at 1330. In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. §§ 404.1527(c), 416.927(c). *Id.* These factors include

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

---

[7] LPCC Rabka and Ms. Zomherhuis were not "acceptable medical sources" such that their opinions could be entitled to controlling weight, however, as Plaintiff's therapists, they are considered "medical sources." SSR 06-03P, 2006 WL 2329939, at * 2. (AR. 535-36)

[8] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

*Watkins v. Barnhart*, 350 F.3d at 1301 (internal citations and quotations omitted); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ need not articulate every factor; however, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))). If the ALJ rejects a treating source opinion completely, he *must* then give "'specific, legitimate reasons'" for doing so. *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*." *Langley*, 373 F.3d at 1121 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (emphasis in original)).

Although the ALJ purports to give Dr. Sievert's opinions "some weight, but not controlling weight," (AR. 536), the ALJ in fact rejected Dr. Sievert's opinions in areas of functioning in which he assessed Plaintiff's limitations as marked. In so doing, the ALJ did not apply the appropriate legal standards or give good reasons for rejecting Dr. Sievert's opinions. Without citing to contradictory medical evidence or giving any specific, legitimate reasons for rejecting Dr. Sievert's opinions, the ALJ instead seemingly relies on her own lay opinion. (AR. 537.) The ALJ's analysis also does not reflect her consideration of the factors enumerated in *Watkins* in her evaluation of Dr. Sievert's opinions.

By the time he assessed Plaintiff's functional limitations, Dr. Sievert, a specialist in the area upon which his opinions were rendered, had been Plaintiff's treating physician for over two years. The opinions that he offered regarding Plaintiff's limitations were informed by Plaintiff's history since 2011. (AR. 1261.) Dr. Sievert's treatment notes indicate that Plaintiff sometimes exhibited signs of psychosis (AR. 478), mania (AR. 478, 486), auditory and visual hallucinations (479, 1233), pressured speech (AR. 1092), suicidal ideations (AR. 1029, 1030, 1091, 1133, 1147, 1187), inappropriate mood (AR. 1029, 1034, 1133, 1187, 1234), paranoia (AR. 1034, 1091, 1147), not oriented to time (1234), tangential thoughts (AR. 1012), and labile affect (AR. 1234) and that she consistently exhibited an anxious mood (AR. 478, 486, 966, 987, 994, 998, 1016, 1021, 1030, 1034, 1040, 1048, 1092, 1106, 1122, 1148, 1187, 1206, 1234). However, the Court cannot discern the degree to which the ALJ accounted for the length of the treatment relationship or the frequency of the examinations, or a consideration of the degree to which Dr. Sievert's opinions were supported by his own treatment notes and the medical evidence and therapy treatment notes found in the record as a whole. *Watkins*, 350 F.3d at 1301. Furthermore, while the ALJ's observations regarding Plaintiff's capabilities are minimally supported by the record, the fact that Plaintiff attended school with accommodations, functioned independently, and sought and maintained gainful employment for the two months directly after the claimed disability term ended does not constitute *medical evidence* upon which the ALJ was permitted to reject a treating physician's opinion. *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (stating that an ALJ "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence"). Finally, by observing that Plaintiff attended school for approximately one year, lived alone, and became employed two months prior to the hearing, the ALJ appears to have selectively relied on evidence that supported a determination of non-disability while failing to explain her

reasons for rejecting substantial medical evidence including Dr. Sievert's own treatment notes, that supported his opinions. This is improper. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (stating that an ALJ may not pick and choose evidence from the record that supports a finding of non-disability while ignoring evidence to the contrary). In sum, the ALJ failed to provide an adequate explanation for rejecting Dr. Sievert's opinions.

The ALJ likewise failed to apply the appropriate legal standards and consider all of the relevant medical evidence when she rejected the opinions of Plaintiff's treating therapists, LPCC Rabka and LPAT Zomerhuis. The regulations state that all relevant evidence will be considered when making a determination about whether an individual is disabled. 20 C.F.R. § 416.927(b). The regulations also contemplate the use of information from "other sources," both medical and non-medical,[9] in making a determination about whether an individual is disabled. *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 404.1513(d), 416.902, 416.913(d)). Recognizing the growth of managed health care in recent years and the increasing use of medical sources who are not technically "acceptable medical sources," SSR 06-03p states that

> medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinion from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

---

[9]Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist. SSR 06-03p, 2006 WL 2329939, at *2. Non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. SSR 06-03p, 2006 WL 2329939, at *2.

SSR 06-03p, 2006 WL 2329939, at *3. Thus, evidence from other medical sources may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at *2. "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1.

An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). Although opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity cannot be given controlling weight, an adjudicator may determine that opinions from such sources are entitled to greater weight than a treating source medical opinion. SSR 06-03p, 2006 WL 2329939, at *6. The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and

any other facts that tend to support or refute the opinion.  SSR 06-03p, 2006 WL 2329939, at *4-5.

The ALJ gave "some weight" to LPCC Rabka's opinions.  (AR. 535.)  The ALJ reasoned that although "LPCC Rabka has treated [Plaintiff] and can be expected to have some familiarity with her mental health condition . . . his opinion is not fully consistent with the medical evidence of record" because "records from her treating mental healthcare providers shows that [Plaintiff] was attending school regularly and reportedly doing well with it."  (AR. 535-36.)  This finding is not supported by substantial evidence.  In support of this finding, the ALJ cited one page of Dr. Sievert's "Medical Assessment of Ability to do Work-Related Activities" form and (AR 536, 1261) and a March 5, 2014[10] treatment note from Plaintiff's social worker, Elizabeth Sanchez, indicating that Plaintiff had been "attending school regularly and not isolating"; but which also noted, among other things, that Plaintiff "has issues with understanding and completing things on her own without observation[.]"  (AR. 536, 1319.)  The ALJ's reasoning also does not appear to apply the proper legal standards in evaluating this other source opinion, and instead disregards LPCC Rabka's opinion supporting greater limitations based on improper cherry-picking and selective reading of portions of the record.  To that end, the Court observes that the ALJ relied on Ms. Sanchez's March 5, 2014, treatment note to support the notion that Plaintiff was "doing well with" school attendance, while ignoring Dr. Sievert's treatment note from the same day indicating that Plaintiff had not showered for about a month and that she was having daily visual hallucinations "where she can enter a different dimension through the floor or wall."  (AR. 937.)  Further, it is not at all clear whether and if so how the ALJ's citation to a portion of Dr. Sievert's opinion—which largely accords with that of LPCC Rabka in their respective assessments of

---

[10] The Court observes that LPCC Rabka was Plaintiff's therapist in January and February 2013, and he was not treating Plaintiff in March 2014.

Plaintiff's marked and moderate limitations—supports the ALJ's decision to reject Dr. Rabka's opinions. (Compare AR 468-69 with AR 1261-62.)

The ALJ also gave "some weight" to LPAT Zomerhuis' opinions. (AR. 536.) But, as with Dr. Sievert's opinions, the ALJ rejected LPAT Zomerhuis' opinions supporting greater functional limitations on the ground that Plaintiff "maintained the ability to function independently, attend school, and . . . seek and maintain employment during the alleged disability period." (AR. 536.) The ALJ also noted that Plaintiff "reported that she was generally stable when taking medications" citing, in support of this finding, a single treatment note from April 23, 2015, in which LPAT Apodaca (the therapist that treated Plaintiff *after* LPAT Zomerhuis ended her treatment in June 2014) noted that Plaintiff "appeared pretty stable today."[11] (AR. 536, 1024) Notably, a treatment note made by Dr. Sievert six days earlier indicated that Plaintiff was anxious, she had difficulty concentrating, racing thoughts, and reported that function was "very difficult"; and a treatment note made by Dr. Sievert on April 13, 2015 indicated that Plaintiff had difficulty concentrating, she was depressed or hopeless, she had racing thoughts, and suicidal ideation, among other issues (AR. 1020, 1029.) Further, the ALJ's opinion does not indicate that she considered the degree to which LPAT Zomerhuis' treatment notes—representing her impressions of Plaintiff over the course of twenty-four individual therapy sessions from June 2013 to June 2014—accorded with her opinions of Plaintiff's limitations and the other medical evidence. Nor does the ALJ's analysis indicate that she considered any other of the facts in the record that tend to support LPAT Zomerhuis' opinions. The ALJ's cursory and selectively-supported rationale for rejecting LPAT

---

[11] While it was permissible for the ALJ to rely on LPAT Apodaca's treatment notes as evidence to contradict LPAT Zomerhuis' opinions, the ALJ appears to have engaged in impermissible picking and choosing. For example, LPAT Apodaca's treatment notes from immediately subsequent visits indicated, among other things, that Plaintiff had "pressured speech and non-stop tangential thinking" on May 8, 2015; she had a manic mood, pressured speech, and tangential thought processes on June 23, 2015; and although her symptoms were improved on July 7, 2017, she was manic and displayed tangential thoughts on July 27, 2017. (AR. 1067.)

Zomerhuis' opinions does not facilitate this Court's review of her determination which is not supported by substantial evidence. *See Clifton*, 79 F.3d at 1009 ("In the absence of ALJ findings supported by specific weighing of the evidence" the Court cannot assess whether the ALJ "applied the correct legal standards to arrive at that conclusion.").

Here, the ALJ failed to apply the correct legal standards and to provide this court with a sufficient basis to determine that appropriate legal principles have been followed, and the ALJ's rationale for rejecting the opinions of Plaintiff's treating source physician and her two treating therapists is not supported by substantial evidence. Accordingly the Court recommends that this matter be remanded for further proceedings.

### C. Remaining Issues

The Court will not address Plaintiff's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### III.   CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion to Reverse or Remand (Doc. 25) be **GRANTED**, and that this matter be **REMANDED** to the Commissioner for further proceedings.

Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(c). Within fourteen (14) days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to Section 636(b)(1)(c), file written objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico. A party must file any objections within the fourteen-day period

allowed if that party wants appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

_____
**KIRTAN KHALSA**
**United States Magistrate Judge**